IN the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
Paul W. HUMPHREY, Attorney at Law:

OFFICE OF LAWYER REGULATION,
Complainant-Respondent,

v.

Paul W. HUMPHREY, Respondent-Appellant.

Supreme Court

No. 2006AP2842–D. *Oral argument April 10, 2008.*
*—Decided March 30, 2012.*

2012 WI 32

(Also reported in 811 N.W.2d 363.)

532

For the respondent-appellant there were briefs filed by *Lester A. Pines* and *Cullen, Weston, Pines & Bach LLP*, Madison and oral argument by *Lester A. Pines*.

For the Office of Lawyer Regulation, there was a brief filed by *William F. Bedker* and oral argument by *William F. Bedker*.

¶ 1. PER CURIAM. Attorney Paul W. Humphrey appeals a report and recommendation filed by Referee Russell Hanson, recommending a public reprimand based on the referee's conclusion that Attorney Humphrey committed professional misconduct in his handling of a criminal prosecution. For the reasons stated herein, we conclude that Attorney Humphrey's misconduct warrants a 30–day suspension of his license to practice law in Wisconsin along with the imposition of the full costs of this proceeding.

¶ 2. Attorney Humphrey was admitted to practice law in Wisconsin in 1989. He has no prior attorney disciplinary history before this court.

¶ 3. On November 17, 2006, the Office of Lawyer Regulation (OLR) filed a complaint against Attorney Humphrey alleging three counts of professional misconduct relating to the criminal prosecution of Adam Raisbeck.

¶ 4. This disciplinary matter has been pending a long time and the parties, the referee, and the public are entitled to know why. Defense counsel in the *Raisbeck* matter, Attorney Joseph Sommers, was also charged with professional misconduct in connection with that case. Each disciplinary case was considered separately on its own record, briefs, and arguments. However, both attorneys asserted the conduct of the other affected their own actions. We deemed it prudent to hold this case in abeyance until the *Sommers* matter was ready for a decision. We did not anticipate the procedural complications that would develop in the *Sommers* case or the difficulty we would face in determining the appropriate sanction for each lawyer's respective misconduct.[1] These are difficult cases stemming from a difficult prosecution, but our decision today reflects most careful consideration.

¶ 5. The factual background relating to the underlying criminal prosecution will be discussed only insofar as it is relevant to this particular disciplinary proceeding. On September 1, 2001, Adam Raisbeck, then age 17, was involved in a one-car rollover accident that occurred in the Town of Medina. One passenger was killed and another passenger was injured. Dane County sheriff's deputies investigating the accident conducted an accident reconstruction, photographed the scene, and interviewed witnesses.

¶ 6. In December 2001 Raisbeck was charged with one count of homicide by negligent operation of a motor vehicle and one misdemeanor charge in connection with the injuries sustained by the second passenger. Attorney

---

[1] The disciplinary proceeding against Attorney Sommers is being resolved in a separate opinion also issued today. *See In re Disciplinary Proceedings Against Joseph L. Sommers,* 2012 WI 33 (Case No. 2006AP2851–D).

Humphrey, who is an assistant district attorney with the Dane County District Attorney's office, was assigned to prosecute the case. Raisbeck retained Attorney Joseph Sommers as his defense counsel. Raisbeck was later acquitted.

¶ 7. At two preliminary hearings on January 28, 2002, and February 15, 2002, Attorney Sommers sought to formally subpoena the photographs of the accident scene. The subpoena was quashed, as premature, because it is the policy of the district attorney's office to provide such information only after arraignment. At the February 15, 2002 preliminary hearing, Attorney Humphrey argued that the evidence indicated Raisbeck was driving about 88 miles per hour, some 33 miles per hour over the posted speed limit. The defense challenged that assumption, citing discrepancies in the physical evidence. Probable cause was found and Raisbeck was bound over for trial.

¶ 8. On or about February 11, 2002, Attorney Humphrey sent his set of 8 by 10 inch accident scene photographs to an accident reconstruction specialist, Robert Krenz, for professional analysis. Mr. Krenz apparently kept this set of pictures until about April 24, 2002.

¶ 9. On March 12, 2002, Raisbeck was formally arraigned. Attorney Sommers then filed a five-page discovery demand requesting, among other items, "copies of all books, papers, documents, photographs, and tangible objects related to this case" and "a written summary of all oral statements of the defendant which the State plans to use in the course of the trial and the names of witnesses to the defendant's oral statements."

¶ 10. On March 13, 2002, Attorney Humphrey sent 84 pages of discovery materials to Sommers in response to the discovery request. These materials did

not include the accident scene photographs. Sommers had asserted he told Attorney Humphrey he wanted to see these photographs numerous times. Attorney Humphrey has maintained that these requests were informal, such as while walking down the hall at the courthouse, and that he did not remember them or did not consider them official requests. Attorney Humphrey has asserted that Sommers stated he specifically wanted to see *Attorney Humphrey's* working set of photos, as opposed to a general set of photographs. Attorney Humphrey asserts the usual procedure for defense counsel to obtain a set of crime scene photographs is for the defense attorney to write a letter to the district attorney requesting authorization for the sheriff's department, as the custodian of the negatives, to release a set of photographs to the defense. Attorney Humphrey asserts that Sommers was aware of this procedure.

¶ 11.   On or about April 25, 2002, Attorney Humphrey wrote a letter to Sommers regarding the accident scene photographs. In that letter he indicated that if Sommers would stipulate to their foundation, Attorney Humphrey could give him a set of photographs. He advised Sommers that, alternatively, Sommers could obtain copies of the photographs directly from the Dane County Sheriff's Department. Sommers asserted this letter was sent one day after a verbal exchange where Attorney Humphrey promised Sommers that Sommers could see Attorney Humphrey's set of photographs, and then apparently told Sommers that the photos were still with the accident reconstruction expert.

¶ 12.   On May 2, 2002, Attorney Humphrey wrote a letter to Sommers providing specific information and specific authorization for Sommers to obtain accident photographs directly from the Dane County Sheriff's Department.

537

¶ 13. On May 10, 2002, Sommers wrote to the Dane County Sheriff's records department formally requesting a set of accident scene photographs and including the requisite fee.

¶ 14. On the morning of the final pretrial conference on May 21, 2002, Sommers asked Attorney Humphrey why he had not yet received the photographs. Sommers said that his defense expert needed the photographs to conduct the defense's own accident reconstruction. Sommers apparently received his set of 5 by 7 inch photographs later that same day. The size of the photographs requested by Sommers is relevant because the parties later realized that certain relevant markings were visible on the 8 by 10 inch photographs but were not visible on the smaller 5 by 7 inch photographs. There is no indication either attorney knew in advance that the size of the photograph would affect whether the markings were visible on the photographs.

¶ 15. On May 22, 2002, Attorney Humphrey filed a motion to compel discovery of the defense expert's report. This motion included Attorney Humphrey's affidavit which stated in paragraph 8: "[O]ver two months ago, the State provided over 84 pages of discovery materials, *made the photographs available to the defendant,* and provided the scale diagram." (Emphasis added.)

¶ 16. On May 31, 2002, Sommers wrote to the presiding judge in the *Raisbeck* matter, the Honorable Paul Higginbotham, and asserted that paragraph 8 of the Humphrey affidavit was "a bald-faced lie." Sommers' letter provided a summary of his communications with Attorney Humphrey regarding his efforts to obtain the photographs. The bottom line, according to Sommers, was that Attorney Humphrey knew Sommers had not received copies of the photographs until May 21, 2002.

¶ 17. At the June 7, 2002, hearing on the motion to compel discovery, Attorney Humphrey stated on the record that the photos "were made available to Mr. Sommers way back in March actually." The trial court asked Attorney Humphrey how he responded to Sommers' assertion that Sommers did not truly have access to the photos in March. Attorney Humphrey replied: "He had access to the photographs back in April, on April 25 if you want to come in and look at them, or if he wanted to stipulate to chain, he could have taken them out of my office at any time." Attorney Humphrey suggested that Sommers was planning a "trial by ambush" by failing to timely produce an expert report.

¶ 18. Sommers vehemently maintained that Attorney Humphrey did not make the photographs available to him, stating: "That is just a bald-face lie. He submitted a false affidavit. Your Honor, that is a big thing."

¶ 19. Attorney Humphrey's position has been that Sommers could have submitted a written request for authorization to see the accident scene photographs at any time after Raisbeck's arraignment, but that he opted not to do so until May 10, 2002. Attorney Humphrey maintains Sommers was fully aware of the typical protocol for obtaining accident scene photos. Attorney Humphrey includes in his submissions a form letter that is often used by defense counsel to make such requests.

¶ 20. In the context of the hearing on the motion to compel, Judge Higginbotham stated to Attorney Humphrey: "I think you did fabricate in your affidavit when you stated that these photos were made available to Mr. Sommers way back when. . . . [T]hen to come in here and to claim ambush by Mr. Sommers is totally disingenuous. It's not true at all."

¶ 21. Attorney Humphrey later wrote to Judge Higginbotham in an effort to clarify his position, de-

scribing paragraph 8 of the challenged affidavit as "sloppy draftsmanship." He maintained, however, that the typical procedure in such cases is for defense counsel to send a letter to the prosecutor requesting authorization to obtain the photographs from the sheriff's department.

¶ 22. Sommers moved to dismiss the criminal prosecution on the ground of prosecutorial misconduct. At the hearing on this motion, Judge Higginbotham commented, with respect to the affidavit: "I specifically find it has nothing to do with proper draftsmanship. That you [Attorney Humphrey] clearly misled the court on that issue."

¶ 23. However, in this disciplinary appeal, Attorney Humphrey claims that the referee's report fails to note the district attorney later asked the trial court to rescind this statement. He contends that the trial court agreed.[2]

¶ 24. In the first count of the disciplinary complaint the OLR alleges that, by averring in an affidavit that he had made the photographs available "over two months ago," Attorney Humphrey engaged in conduct involving dishonesty, deceit, or misrepresentation in violation of former SCR 20:8.4(c)[3] (Count One).

---

[2] There is no evidence in the record before us as to whether the circuit court revisited its findings to conclude that Attorney Humphrey's statements were exaggerations rather than intentional misrepresentations, and we conclude that this would not alter our ultimate conclusion here.

[3] Effective July 1, 2007, substantial changes were made to the Wisconsin Supreme Court Rules of Professional Conduct for Attorneys, SCR Chapter 20. *See* S. Ct. Order 04–07, 2007 WI 4, 293 Wis. 2d xv, 726 N.W.2d Ct.R-45 (eff. July 1, 2007); and S. Ct. Order 06–04, 2007 WI 48, 297 Wis. 2d xv, 730 N.W.2d Ct.R.-29 (eff. July 1, 2007). Because the conduct underlying this case

¶ 25. The remaining counts in the OLR disciplinary complaint also relate to the trial preparations in the *Raisbeck* matter. On June 12, 2002, Attorney Humphrey gave Sommers a synopsis of his expert's accident reconstruction report. At some date prior to August 15, 2002, Attorney Humphrey and his expert met to discuss this report. On August 15, 2002, Attorney Humphrey and the expert apparently exchanged e-mails addressing a summary of the expert's anticipated trial testimony.

¶ 26. Meanwhile, Sommers and his defense expert reviewed the 5 by 7 inch photographs he received from the sheriff's department. None of these photographs showed a close-up of the tire markings. Sommers argued that without such a close-up view of the tire markings it was impossible to evaluate the State's assertion that the tire markings were "critical speed scuffs" rather than "brake-induced skid marks." Again, the defense considered the tire markings highly relevant evidence for assessing the speed of Raisbeck's vehicle when taking the curve in the road before the accident occurred.

¶ 27. Sommers argued the State expert's opinion that the tire markings were "speed scuffs" was vital to the State expert's conclusion that Raisbeck was driving 88 miles per hour at the time of the accident. Sommers did not see markings on his set of photographs and thus moved to dismiss the prosecution on the ground that the State had failed to preserve critical tire marking evidence.

---

arose prior to July 1, 2007, unless otherwise indicated, all references to the Chapter 20 of the Wisconsin Supreme Court Rules will be to those in effect prior to July 1, 2007.

SCR 20:8.4(c) stated it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation; . . . ."

¶ 28. At the August 22, 2002 hearing on this motion Sommers subpoenaed sheriff's deputies together with their copies of the accident scene photographs. Deputy Sewell appeared at the hearing. He testified that he had brought his set of accident scene photographs to court for a previous court hearing, but no longer had the photographs in his possession and did not know where they were. A discussion among counsel and the court ensued. The court asked Attorney Humphrey if he had the photographs. Attorney Humphrey's response to the court's inquiry forms the basis for the second disciplinary count alleged against him. Attorney Humphrey responded: "I have two photos. I don't know if these are the ones he wants. They are the photos of black marks on the roadway." Sommers characterized Attorney Humphrey's response and the State's failure to produce a full set of photographs at the hearing as "underhanded." Judge Higginbotham responded to Sommers that: "Nobody has said that Mr. Humphrey had [the photographs]." However, the OLR complaint alleges that at the time of this exchange, Attorney Humphrey knew he in fact had, in his office, a complete set of 8 by 10 inch accident scene photos but did not disclose this fact to the trial court. Judge Higginbotham asked Attorney Humphrey: "Now, Mr. Humphrey, do you know where the photos are?" Attorney Humphrey replied: "No, I do not." Attorney Humphrey has maintained he thought the trial court was inquiring specifically about the location of the set of photographs originally in the possession of Deputy Sewell.

¶ 29. The court ultimately used the two 8 by 10 inch photos that Attorney Humphrey had with him in the courtroom as well as Sommers' 5 by 7 inch set of photographs. The motion to dismiss was denied.

¶ 30. With respect to this exchange, the OLR complaint alleges that, by failing to disclose he knew where the photos were during the August 22, 2002 hearing, Attorney Humphrey knowingly made a false statement of material fact to a tribunal in violation of SCR 20:3.3(a)(1),[4] and engaged in conduct involving dishonesty, deceit, or misrepresentation in violation of SCR 20:8.4(c) (Count Two).

¶ 31. The third count of the OLR complaint involves the timing of disclosure of a witness statement to Attorney Sommers. When the sheriff's deputies first investigated the accident, Kevin McCoy, an acquaintance of Raisbeck, told investigators that he had seen Raisbeck's passengers the night before the accident but that he did not know where they went after that. This innocuous statement was included in the discovery responses sent to Sommers.

¶ 32. On September 18, 2002, Attorney Humphrey advised Sommers he intended to call McCoy as a witness at trial but noted that he did not have an address for him. On October 15, 2003, Attorney Humphrey sent Sommers a witness list that included McCoy's name together with his address.

¶ 33. On or about October 21, 2003, Attorney Humphrey and Detective Greiber of the Dane County Sheriff's Department met with McCoy in preparation for trial. At the time of this meeting, the *Raisbeck* trial was scheduled to commence on October 27, 2003. Detective Greiber later prepared a memorandum dated October 27, 2003, that summarized the meeting. At the meeting, McCoy apparently stated he had spoken to Raisbeck in the spring following the accident, and that

---

[4] SCR 20:3.3(a)(1) provided that a lawyer shall not knowingly "make a false statement of fact or law to a tribunal; . . . ."

Raisbeck had said he was feeling sad about the accident, that he admitted to McCoy it was foggy and he was driving too fast, that he could not see the sign, and he drove off the road. This statement was significant because Raisbeck, who was injured in the accident, had previously stated he had no recollection of the accident.

¶ 34. On October 23, 2003, the trial was postponed until January 20, 2004. On November 12, 2003, Attorney Humphrey sought a bench warrant identifying McCoy as a material witness who "has already not appeared on one subpoena and is unlikely to appear on a subpoena in the future." A bench warrant directing McCoy's arrest was issued the same day. On December 11, 2003, Sommers wrote the court asking how McCoy could be deemed a "material witness" given his innocuous statement on September 1, 2001.

¶ 35. On January 7, 2004, Attorney Humphrey disclosed McCoy's October 21, 2003 statements to Sommers via a cover letter stating that "[w]hile it is not discoverable, I thought I would send these notes [along] anyway." At the time this letter was sent, trial was scheduled to commence on January 20, 2004.

¶ 36. The OLR complaint alleges that by failing to turn over to the defense until January 7, 2004, an October 21, 2003 witness statement containing incriminating declarations, Attorney Humphrey did, in pretrial procedure, fail to make a reasonably diligent effort to comply with a valid discovery request by an opposing party in violation of SCR 20:3.4(d)[5] (Count Three).

---

[5] SCR 20:3.4(d) stated a lawyer shall not "in pretrial procedure, make a frivolous discovery request or fail to make reasonably diligent effort to comply with a legally proper discovery request by an opposing party; . . . ."

¶ 37. Attorney Humphrey defends the timing of his disclosure of the witness statement. He claims that he initially viewed the statement as privileged work product because the statement was not exculpatory, and only later realized that as a statement of a party defendant it should be disclosed.

¶ 38. With respect to the timing, he asserts that everyone involved assumed the trial would be delayed again because Sommers had filed an interlocutory appeal that had stayed the trial court proceeding. Moreover, the parties involved were all aware that the defense expert was going to be unavailable in January. Attorney Humphrey notes that the trial did not in fact occur until April 18, 2005, some 15 months after he disclosed the McCoy witness statement to Sommers.

¶ 39. The OLR sought summary judgment on Count Three of the complaint based on the fact that in his answer, Attorney Humphrey admitted the facts alleged in the OLR complaint with respect to Count Three. On June 25, 2007, the referee granted the OLR's motion for summary judgment on Count Three, stating: "[t]he respondent having admitted all factual allegations of Count 3, it, therefore, appears that there is no genuine issue as to any material fact."

¶ 40. Attorney Humphrey sought reconsideration of this ruling, emphasizing he did not admit the inferences that the OLR wanted the trier of fact to draw from the factual allegations—namely, that he failed to disclose the witness statement until 13 days before trial. Moreover, he argues that the summary judgment ruling precluded him from presenting any affirmative defenses to the charge.

¶ 41. The evidentiary hearing in this disciplinary matter was conducted on July 10 and 11, 2007. The referee denied Attorney Humphrey's motion for recon-

sideration of the summary judgment order at this hearing but permitted Attorney Humphrey to make an offer of proof that the *Raisbeck* trial did not occur until 15 months after the witness statement was disclosed.

¶ 42. On August 2, 2007, the referee issued his report and recommendation. With respect to Count One, the referee agreed that Attorney Humphrey's affidavit "misled the court" and concluded that Attorney Humphrey violated SCR 20:8.4(c).

¶ 43. With respect to Count Two, the referee was not persuaded by Attorney Humphrey's claim that he misunderstood which set of accident scene photographs the court meant when the court asked if Attorney Humphrey had a set of photographs. The referee concluded that Attorney Humphrey knowingly made a false statement of fact to a tribunal in violation of SCR 20:3.3(a)(1), and engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of SCR 20:8.4(c).

¶ 44. Finally, with respect to Count Three, the referee recited the factual allegations in the complaint and reiterated his granting of summary judgment to the OLR on this charge.

¶ 45. On appeal Attorney Humphrey challenges the referee's findings and conclusions and provides context for the allegations against him.[6] He explains the usual protocol regarding production of accident

---

[6] Oral argument in this matter was conducted on April 10, 2008. On July 30, 2008, this court issued an order holding this matter in abeyance until further order of the court. On December 14, 2009, Attorney Humphrey filed a very brief motion seeking "additional oral argument in the matter" on the ground that the composition of the court had changed since the court last considered the matter. The motion was held in abeyance and is hereby denied.

photographs, noting that Sommers did not follow the usual procedure of submitting a request letter to the district attorney immediately after arraignment. Attorney Humphrey explains that Sommers had specifically emphasized that he wanted to see *Attorney Humphrey's* copies of the photographs, which had been sent to the State's accident reconstruction specialist. He explains that around April 24, 2002, Attorney Humphrey told Sommers he could come to Attorney Humphrey's office to see the photos. At this meeting he realized the expert witness had not yet returned them. Attorney Humphrey then wrote Sommers letters on April 25, 2002, and May 2, 2002, providing details as to how Sommers could obtain a set of photographs directly from the sheriff's department.

¶ 46. With respect to the affidavit forming the basis for Count One of the complaint, Attorney Humphrey defends his use of the term "available" in the affidavit where he stated that he made the photographs "available" to Sommers some two months prior to the date of his motion to compel. He reiterates Sommers could have pursued other strategies to obtain the accident scene photographs directly from the sheriff's department.

¶ 47. With respect to Count Two, Attorney Humphrey also maintains that during the in-court discussions about the location of the accident scene photographs, Attorney Humphrey thought they were specifically talking about the location of *Deputy Sewell's* missing set of photographs because Sommers had stated that he did not trust the district attorney's office and that is why he subpoenaed Sewell and his photographs.

¶ 48. With respect to Count Three, Attorney Humphrey also emphasizes that the parties knew in

October, when the McCoy witness statement was taken, that the trial would be postponed because the court of appeals had stayed the trial court case by order dated October 22, 2003, and Sommers had advised the court that his expert would be unavailable in January because of a vacation. He notes again the trial did not in fact occur until 15 months following disclosure of the witness statement.

¶ 49.   We review a referee's findings of fact subject to the clearly erroneous standard. *See In re Disciplinary Proceedings Against Eisenberg,* 2004 WI 14, ¶ 5, 269 Wis. 2d 43, 675 N.W.2d 747. We review the referee's conclusions of law de novo. *Id.* Pursuant to our obligation to supervise and regulate the practice of law in this state, we determine the appropriate level of discipline independent of the referee's recommendation. *See In re Disciplinary Proceedings Against Widule,* 2003 WI 34, ¶ 44, 261 Wis. 2d 45, 660 N.W.2d 686.

¶ 50.   The referee made the following findings of fact with respect to Count One:

- It appears that tire marks were not visible on the 5 by 7 inch photographs that Sommers obtained from the sheriff's department but were visible on the 8 by 10 inch photographs Attorney Humphrey gave to his accident reconstruction specialist.

- The Dane County Sheriff's Department at various times stated there were 33, 45, 46, and 50 photographs.

- It was reasonable for Sommers to be certain he had seen all photographs.

- On May 2, 2002, Attorney Humphrey sent a letter to defense counsel which stated, in part:

At your recent request for your own copies of all the photos, I contacted the Court Officer of the DSCO. Here's what you need to do.

- It is clear from the record that the court wanted to be sure discovery had been timely produced. Trial was then scheduled for late June.

- On May 22, 2002, Attorney Humphrey filed an affidavit with the court that stated in relevant part that photos had been made "available" to the defense for over two months.

- On June 7, 2002, Judge Higginbotham stated to Attorney Humphrey:

> Mr. Humphrey, I've not been happy with your conduct either. I agree with Mr. Sommers and that the situation with [Raisbeck] should never have gone that way. But, secondly, I think you did fabricate in your affidavit when you stated that these photos were made available to Mr. Sommers way back when. That's not true. Even based on these letters it's clear to me that those photos were never made actually available. . . .

- After being told that he had "fabricated" and was "totally disingenuous" Attorney Humphrey's response to the court was tepid at best.

¶ 51. The referee further notes that on April 7, 2003, the court stated: "I specifically find it has nothing to do with proper draftsmanship. That [Attorney Humphrey] clearly misled the court on that issue." The referee adds that "any reasonable interpretation of the facts [shows] that for whatever reason [Attorney Humphrey] deliberately misled the court."

¶ 52. On this appeal, Attorney Humphrey takes issue with several of the referee's findings of fact and the inferences drawn therefrom. For example, the ref-

eree comments on confusion regarding the number of accident scene photographs. Attorney Humphrey points out, however, that as of the May 2, 2002 hearing, there was no confusion about the number of accident scene photographs. He contends the confusion over the number of photographs did not arise until the hearing on August 22, 2002.

¶ 53. Attorney Humphrey also challenges the referee's finding that Attorney Humphrey's response to the court's statements about the veracity of his affidavit was "tepid." Attorney Humphrey responds that he consistently stated on the record that his statements were "true." He defends his response in the trial court, describing the colloquy that occurred immediately after the court made these statements to Attorney Humphrey. There, the trial court strongly chastised Sommers for interrupting him and contradicting the court. Attorney Humphrey asserts that given the timing and tenor of the court's remarks to counsel, he "would have been ill-advised to have said anything in response to Judge Higginbotham's statement about him." He explains that, instead, he filed a motion asking the court to withdraw his conclusion and states the court agreed to do so. Attorney Humphrey also suggests the referee failed to correctly analyze the requirements necessary to sustain a claim for misrepresentation. *See In re Disciplinary Proceedings Against Marks,* 2003 WI 114, ¶ 50, 265 Wis. 2d 1, 665 N.W.2d 836.

■

¶ 54. First, we conclude the referee's factual findings with respect to Count One are not clearly erroneous, with one exception. We conclude the record evidence before the court supports Attorney Humphrey's assertion that he has consistently maintained his affidavit was correct. As such, the court does not agree with

the referee's finding that Attorney Humphrey tacitly "conceded" the statements in his affidavit violated the rules. However, the other factual findings regarding Count One are supported by the record and are not clearly erroneous.

■

¶ 55. Ultimately, the referee was required to make a credibility determination as to whether Attorney Humphrey knew or should have known his statement that he made the photographs "available" to Sommers was a fair and accurate representation of matters. Although there may be technical merit to Attorney Humphrey's claim the photos were theoretically available to Sommers by other means, we agree with the referee's conclusion that Sommers did not have the accident scene photos when Attorney Humphrey filed his motion to compel and Attorney Humphrey knew it. We are not persuaded by Attorney Humphrey's assertion that the referee was required to analyze each element of a misrepresentation claim in order to find misconduct here. It is unnecessary to prove the tort of misrepresentation in order to establish by clear and convincing evidence that an attorney has violated a rule of professional conduct proscribing attorney conduct involving dishonesty, fraud, deceit, or misrepresentation. *See Marks*, 265 Wis. 2d 1, ¶ 50; *In re Disciplinary Proceedings Against Schalow*, 131 Wis. 2d 1, 12–13, 388 N.W.2d 176 (1986).

¶ 56. The record indicates both the trial court in the *Raisbeck* matter and the referee in this disciplinary proceeding were firmly of the opinion that Attorney Humphrey's statement that the photographs had been "available" to the defense for months constituted misrepresentation within the meaning of the Rules of Professional Conduct for Attorneys. We defer to the

referee's credibility determinations and we accept the referee's conclusion that Attorney Humphrey violated SCRs 20:8.4(c) and 20:3.3(a)(1) with respect to paragraph 8 of his affidavit.

¶ 57. The second count of the OLR complaint alleges that, by failing to disclose he knew where the photos were during the August 22, 2002 hearing, Attorney Humphrey knowingly made a false statement of material fact to a tribunal and engaged in conduct involving dishonesty, deceit, or misrepresentation.

¶ 58. Attorney Humphrey has maintained he thought the trial court was inquiring specifically about the location of the set of photographs originally in the possession of Deputy Sewell. This, again, called for a credibility determination. The referee concluded Attorney Humphrey knew or should have known that the trial court was inquiring generally about an 8 by 10 inch set of photographs at this hearing. Again, we decline to challenge the referee's credibility determination, and we accept the referee's conclusion that by claiming he had no knowledge of the whereabouts of the set of photographs in response to the trial court's inquiry, Attorney Humphrey knowingly made a false statement of material fact to a tribunal in violation of SCR 20:3.3(a)(1) and engaged in conduct involving dishonesty, deceit, or misrepresentation in violation of SCR 20:8.4(c).

¶ 59. Count Three of the OLR complaint alleges that, by failing to turn over to the defense until January 7, 2004, an October 21, 2003 witness statement of Kevin McCoy containing incriminating declarations, Attorney Humphrey did, in pretrial procedure, fail to make a reasonably diligent effort to comply with a valid discovery request by an opposing party.

¶ 60. As noted, the referee granted the OLR's motion for summary judgment on this claim concluding that Attorney Humphrey admitted the factual allegations in the complaint. Thus, we must consider whether the admitted factual elements of the complaint, alone, support the legal conclusion that Attorney Humphrey violated SCR 20:3.4(d) by failing to disclose a witness statement completed on October 21, 2003, until January 7, 2004. We hold that it was error for the referee to grant summary judgment on this count.

¶ 61. Wisconsin Stat. § 971.23 requires the State to turn over such a statement within a "reasonable time before trial." Attorney Humphrey asserts "[i]t is axiomatic that when an assistant district attorney complies with Wis. Stat. § 971.23 he cannot have violated SCR 20:3.4(d) which states: 'A lawyer shall not . . . in pretrial procedure, . . . fail to make reasonably diligent efforts to comply with a legally proper discovery request.' " He notes he had over 500 assigned cases at the time of the belated disclosure.

¶ 62. We do not condone the length of time it took Attorney Humphrey to disclose an important witness statement to defense counsel in this case, particularly in view of the manner in which this prosecution was handled. However, we must conclude that the disciplinary complaint, alone, is not an adequate factual basis to support the conclusion that Attorney Humphrey violated SCR 20:3.4(d). The facts set forth in the complaint do not allege when the actual trial occurred, nor do they recite whether there was any harm to the *Raisbeck* defense occasioned by the delay. It is apparent from submissions this court has received from Sommers and remarks made by the referee that there is considerably more to the story with respect to this witness state-

ment. However, this information cannot form the basis of our ruling because this matter was decided on summary judgment.[7] This court will not make factual findings that the referee could have made but did not. *See In re Disciplinary Proceedings Against Wood,* 122 Wis. 2d 610, 615–16, 363 N.W.2d 220 (1985); *see also In re Disciplinary Proceedings Against Swartwout,* 116 Wis. 2d 380, 383, 342 N.W.2d 406 (1984) (court will not conduct de novo review of record or independently make factual findings). Taking, as we must, the undisputed facts viewed in the light most favorable to Attorney Humphrey, we must conclude that the admissions to the facts alleged in the complaint alone do not establish a violation SCR 20:3.4(d). We decline to remand this matter, and we dismiss this charge.

¶ 63. We now turn to the appropriate discipline in this matter. The referee stated he found making a recommendation with respect to the appropriate discipline in this matter difficult. He acknowledged Attorney Humphrey's previously excellent record, but stated, "the fact that he may have been driven to them by over work or his apparent intense dislike of his opponent is no excuse" and concluded "the least I can recommend is a public reprimand."

---

[7] In the narrative portion of his report, the referee mentions that the trial court later sanctioned the State by prohibiting the State from calling McCoy as a witness in the *Raisbeck* trial. The referee also mentions that Attorney Humphrey was removed as a prosecutor in the *Raisbeck* matter allegedly because of his conduct with respect to Count Three. These peripheral findings are not technically part of the record in this disciplinary matter because Attorney Humphrey successfully moved to strike this testimony based on the referee's decision to grant summary judgment.

554

¶ 64. The record reflects the OLR considered several cases in recommending its proposed sanction of a public reprimand. *See, e.g., In re Disciplinary Proceedings Against Teasdale,* 2005 WI 12, 278 Wis. 2d 76, 692 N.W.2d 244 (failure to respond to a discovery request); *In re Disciplinary Proceedings Against Johann,* 216 Wis. 2d 118, 574 N.W.2d 218 (1998) (failing to appear for deposition); *In re Disciplinary Proceedings Against Brey,* 171 Wis. 2d 65, 490 N.W.2d 15 (1992) (60–day suspension). We have reviewed these and other cases and conclude that under the facts presented here, a public reprimand is insufficient to achieve the objectives of attorney discipline.

¶ 65. We agree with the referee's implicit observation that the acrimonious relationship between opposing counsel was likely a contributing factor in Attorney Humphrey's conduct. However, the law invests prosecutors with awesome discretionary powers, particularly over the nature of the charge and the decision whether to prosecute. *See, e.g.,* 9 Christine M. Wiseman & Michael Tobin, *Criminal Practice & Procedure* § 6:1 (Wisconsin Practice Series, 2d ed. 2011). A prosecutor is not a mere advocate for a particular side in a case. *Id.* The prosecutor thus serves as "the trustee of the public's law enforcement conscience." *Thompson v. State,* 61 Wis. 2d 325, 332, 212 N.W.2d 109 (1973). Thus, prosecutors must be ever mindful that they wield significant authority and must carefully guard against the temptation to let personal considerations interfere with their obligation to seek justice.

¶ 66. We consider Attorney Humphrey's ethical violations sufficiently serious to warrant a suspension of his license to practice law. The question, then, is the appropriate length of that suspension. Typically, this

court has adhered to a policy of imposing a minimum license suspension of 60 days. *See In re Disciplinary Proceedings Against Osicka,* 2009 WI 38, ¶ 38, 317 Wis. 2d 135, 765 N.W.2d 775; *In re Disciplinary Proceedings Against Grady,* 188 Wis. 2d 98, 108–09, 523 N.W.2d 564 (1994).

¶ 67.   We have concluded that we will deviate from our usual policy of requiring a minimum suspension of 60 days, and we hereby impose a 30–day suspension on Attorney Humphrey's license to practice law in Wisconsin. As we stated in the *Sommers* case, 2012 WI 33 (No. 2006AP2851–D), this is an unusual case that calls for an unusual result.

¶ 68.   We also order that Attorney Humphrey shall bear the full costs of this proceeding which total $16,242.59 as of April 11, 2008.

¶ 69.   IT IS ORDERED that the license of Paul W. Humphrey to practice law in Wisconsin is suspended for a period of 30 days, effective May 7, 2012.

¶ 70.   IT IS FURTHER ORDERED that Paul W. Humphrey shall comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been suspended.

¶ 71.   IT IS FURTHER ORDERED that within 60 days of the date of this order, Paul W. Humphrey shall pay to the Office of Lawyer Regulation the costs of this proceeding. If the costs are not paid within the time specified and Paul W. Humphrey has not entered into a payment plan approved by the Office of Lawyer Regulation, then the Office of Lawyer Regulation is authorized to move this court for a further suspension of the license of Paul W. Humphrey to practice law in Wisconsin.

¶ 72. ANNETTE KINGSLAND ZIEGLER and MICHAEL J. GABLEMAN, J.J., did not participate.

¶ 73. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). The lawyer discipline system, including the work of the Office of Lawyer Regulation (OLR), the Preliminary Review Committee, the referees, and this court, like any system, has its strengths and also its opportunities for improvement. Reasonable people can and do disagree about the virtues, the snags, and the changes needed.[1]

¶ 74. But I am disappointed when a justice of this court unfairly and wrongly undermines the lawyer discipline system, a decision of this court, and the actions of the justices joining the per curiam opinion with unwarranted, unfounded accusations. I therefore write in response to Justice Prosser's concurrence/dissent.

¶ 75. The concurrence/dissent charges that the "handling of [the *Humphrey*] case has been so irregular that it is unfair to the attorney and seriously undermines confidence in the lawyer regulation system, especially the actions of this court." *See* concurrence/dissent, ¶¶ 132, 159.[2]

---

[1] Indeed the court and the Board of Administrative Oversight have often examined and reexamined aspects of the lawyer discipline system to improve it. The chair of the Board of Administrative Oversight, at my request, appointed a committee that reviewed OLR procedures and has offered suggestions for improvement.

[2] "[T]he procedures followed in this case, especially the long delay in this court, are so irregular that they undermine confidence in the lawyer regulation system." Concurrence/dissent, ¶ 159.

557

¶ 76. The concurrence/dissent does not and cannot back up this harsh charge.

¶ 77. In spite of the storm and fury and nasty insinuations about the court's actions, it turns out that the concurrence/dissent disagrees only with the imposition of a 30–day suspension. The concurrence/dissent joins the opinion of the court in concluding that Attorney Humphrey violated the Rules of Professional Conduct twice, by misrepresentations to the trial court.

¶ 78. The referee explicitly found that Attorney Humphrey deliberately misrepresented matters to the trial court: "[A]ny reasonable interpretation of the facts [shows] that for whatever reason [Attorney Humphrey] deliberately misled the court."[3] And the court today (including Justice Prosser) affirms the referee's findings.

¶ 79. While attempting to retry the case and downplay the two counts against Attorney Humphrey, labeling them "semantic disputes,"[4] the concurrence/dissent acknowledges being "not prepared to assert" that the referee's finding that Attorney Humphrey deliberately misled the trial court is "clearly erroneous."[5]

¶ 80. The concurrence/dissent thus takes issue with the per curiam opinion only in preferring to impose a public reprimand rather than a 30–day suspension and in seeking to reduce the costs imposed on Attorney Humphrey.

¶ 81. When you read the concurrence/dissent and discard the hyperbole, inappropriate inferences, and

---

[3] Per curiam, ¶ 51. *See also* per curiam, ¶ 58.

[4] Concurrence/dissent, ¶ 143. *See also* concurrence/dissent, ¶¶ 144–154.

[5] Concurrence/dissent, ¶ 154.

emotional appeal, the writing amounts to "nothing more than a disagreement among justices about whether an attorney should receive a public reprimand or a relatively brief suspension,"[6] an issue that the concurrence/dissent writes is worthy of "little" discussion.[7]

¶ 82.   With the essence of the concurrence/dissent clearly stated, I turn to inventory the purported "irregularities."

## I

¶ 83.   The purported "irregularities" recounted in the concurrence/dissent are as follows:

(A) The time elapsing between the beginning of the OLR proceeding and the imposition of discipline (the release of this decision);

(B) The failure to keep the *Humphrey* and *Sommers* discipline cases separate;

(C) The change in the membership in the court during the pendency of the *Humphrey* discipline case;

(D) The dismissal of the third count while not accepting the lower discipline (public reprimand) recommended by the referee; and

(E) The failure of the per curiam opinion to pursue a defense that Attorney Humphrey claimed but did not prove.[8]

¶ 84.   I will address each in turn.

---

[6] Concurrence/dissent, ¶ 132.

[7] *Id.*

[8] Concurrence/dissent, ¶ 156.

## A

¶ 85. The concurrence/dissent describes the time elapsing between the beginning of the OLR proceeding and the imposition of discipline as "unseemly."[9]

¶ 86. An abbreviated time line of the four steps in the disciplinary proceedings in the *Humphrey* and *Sommers* cases shows that the bulk of the time that has elapsed in the *Humphrey* case between the challenged conduct and the final decision by this court has been at this court.[10] So what happened here?

---

[9] Concurrence/dissent, ¶ 141.

[10] Here is an abbreviated time line:

*(1) The Incident*

9/1/01:    Adam Raisbeck's car rolls over.

4/21/05:    Adam Raisbeck trial; he is acquitted.*

*(2) OLR Proceedings*

11/16/06:    OLR files *Humphrey* complaint.**

11/17/06:    OLR files *Sommers* complaint.

*(3) Referee Proceedings*

8/3/07:    *Humphrey* referee files report and recommendation with Supreme Court.

10/16/09: *Sommers* referee files report and recommendation with Supreme Court.

*(4) Supreme Court Proceedings*

4/10/08:    *Humphrey* oral argument before Supreme Court.

7/30/08: Supreme Court order holding the *Humphrey* case in abeyance.

11/3/10: *Sommers* oral argument before Supreme Court.

3/30/12: *Sommers* and *Humphrey* decisions released by Supreme Court.

*Ordinarily OLR does not investigate or file a complaint during the pendency of a court proceeding during which the incident arises.

¶ 87. The two discipline cases, *Humphrey* and *Sommers,* have their genesis in the same criminal prosecution in which Attorney Humphrey was the prosecutor and Attorney Sommers was the defense counsel. It was clear from the very beginning that the conduct of each attorney affected the conduct of the other. It was reasonable that the discipline imposed in the two cases should, at some point, be considered by this court in tandem.[11]

¶ 88. Thus, on July 30, 2008, soon after the *Humphrey* oral argument in this court, the court, on its own motion, issued a written order holding Attorney Humphrey's case in abeyance, anticipating that the *Sommers* case would be here soon for oral argument.[12] No justice dissented from this order. Justice Prosser belatedly objects today, some three and one-half years later.[13]

¶ 89. Holding the *Humphrey* matter for the *Sommers* matter was the sound, sensible thing to do at the time. No one anticipated that the *Sommers* case would take three years before it came here for oral argument. Nothing irregular or sinister here. Nothing to undermine confidence in the lawyer regulation system, including the actions of this court.

---

\*\*Our goal has been that in most cases a complaint be filed within one year after the investigation begins. We are not there yet. The time, however, of the OLR proceedings in the present case does not account for the bulk of the time that has elapsed in this disciplinary proceeding.

[11] Per curiam, ¶ 4. Neither the majority nor I use the Referee's Findings and Recommendations of Discipline in the *Sommers* case or the record in the *Sommers* case in deciding the *Humphrey* case.

[12] Per curiam, ¶ 45 n.6.

[13] Concurrence/dissent, ¶ 139.

561

¶ 90. Since the *Sommers* case came to this court with oral argument on November 3, 2010, it has taken about 16 months for this court to release the *Sommers* and *Humphrey* decisions. This is too long. Decisions in non-discipline cases in which oral argument was held in November 2010, as was the *Sommers* case, were released before the end of July 2011.[14] We do not have time lines for preparing, circulating, and releasing decisions in discipline cases (as we do for decisions in non-discipline cases). We should. I shall continue to urge the court to set reasonable time lines for all matters that come to this court.

B

¶ 91. The concurrence/dissent asserts that the court should have separated the *Sommers* and *Humphrey* cases, but the concurrence/dissent does not tell the full story. The cases were in fact handled separately, even in this court.

¶ 92. Each case had its own OLR complaint; its own files and records; its own referee (as a result of Sommers' request for substitution); its own report by its own referee; its own set of briefs in this court; and its own oral argument here. The court deliberated on each case separately. Separate opinions were written and considered in each case, but then the court stepped back to assess the discipline to be imposed on each lawyer.[15]

¶ 93. Although the concurrence/dissent forcefully argues that the two cases be kept separate, as they were, it simultaneously suggests that Attorney Som-

---

[14] Decisions in non-discipline cases in which oral argument was held between September 1, 2010, and April 30, 2011, were released before the end of July 2011.

[15] Per curiam, ¶ 4.

mers' request that a new referee be substituted for the *Humphrey* referee who was originally assigned as referee to the *Sommers* case was irregular and worked to Humphrey's disadvantage.[16]

¶ 94.  A lawyer has the right to ask that the named referee be substituted. *See* SCR 22.13(4). This right has been exercised in other cases. Nothing irregular about a substitute referee here.

¶ 95.  Indeed the court granted Attorney Sommers' request that the referee in the *Humphrey* case not be the referee in the *Sommers* case, in part so that the two cases would be separate.

## C

¶ 96.  The concurrence/dissent recounts at length the change in the membership of the court while the *Humphrey* case has been pending. It is viewed as an "irregularity." That a justice retires, resigns, is defeated in election, dies, or recuses himself or herself while a case is pending is not unusual or irregular.[17] Only justices who participate in a case from its beginning ordinarily participate in the case through the end. A justice who declines to participate in a case cannot be forced to participate.

¶ 97.  That only five justices participate in a matter before this court is not an everyday occurrence, but it is not an irregularity. A five-justice decision, with two justices not participating after being given the opportunity to do so, is valid.

---

[16] Concurrence/dissent, ¶ 136.

The disciplinary proceeding against Attorney Sommers is being resolved in a separate opinion released today. *See In re Disciplinary Proceedings Against Sommers,* 2012 WI 33, ___ Wis. 2d ___, ___ N.W.2d ___.

[17] Concurrence/dissent, ¶¶ 137–138.

¶ 98. Nothing irregular or sinister here. Nothing unfair to Humphrey or Sommers. Nothing to undermine confidence in the lawyer regulation system, including the actions of this court.

¶ 99. On December 14, 2009, Attorney Humphrey requested re-argument in this court, urging that the case should be reargued because of the change in the composition of the court.[18] Almost immediately thereafter, on January 12, 2010, the court entered a written order, unanimously holding Humphrey's motion for reargument in abeyance. No justice dissented from this order.

¶ 100. Nevertheless, with the benefit of hindsight, the concurrence/dissent asserts that the court should have granted Attorney Humphrey's motion for reargument.[19] Yet, noticeably, the concurrence/dissent does not request reargument even today.[20]

D

¶ 101. The concurrence/dissent records, as an "irregularity," that the per curiam opinion dismisses the third count of the complaint against Humphrey while imposing discipline in excess of that which the referee recommended.[21]

¶ 102. The concurrence/dissent asserts that it is a "spectacle" that the per curiam opinion fails to accept the referee's recommendation to discipline Attorney Humphrey with a public reprimand while dismissing count three.[22]

---

[18] Per curiam, ¶ 45 n.6.

[19] Concurrence/dissent, ¶ 140.

[20] Per curiam, ¶ 45 n.6.

[21] Concurrence/dissent, ¶ 141. *See* per curiam, ¶¶ 59–62.

[22] Concurrence/dissent, ¶ 141.

¶ 103. The third count implicates Attorney Humphrey in not timely providing information he was required to give Attorney Sommers.[23]

¶ 104. What the concurrence/dissent does not reveal is that count three was dismissed on a procedural ground even though the count appears to have potential merit. Moreover, the remaining two counts of misrepresentation are more than sufficient to support a 30–day suspension.

¶ 105. The per curiam opinion dismisses the third count on the ground that the referee erred in granting summary judgment on this count without holding an evidentiary hearing. The court could have remanded the third court to the referee to hold an evidentiary hearing to determine the merits of this count. A remand causes delay and would have increased the costs incurred by Attorney Humphrey.

¶ 106. Instead, the court exercised its discretion to dismiss the count. The per curiam opinion does not, however, condone the time it took Attorney Humphrey to disclose an important witness statement to Attorney Sommers.[24]

¶ 107. Dismissal of count three appears to be advantageous to Attorney Humphrey.

¶ 108. Dismissal of a count happens with some frequency in lawyer discipline cases. The referee and the court are doing their respective jobs in carefully checking that the Office of Lawyer Regulation proves each count. Nothing irregular or sinister here. Nothing unfair to Humphrey. Nothing to undermine confidence in the lawyer regulation system, including the actions of this court.

---

[23] *See* per curiam, ¶¶ 31–44, 48, 59–62.

[24] Per curiam, ¶ 62.

¶ 109. The court considers carefully a referee's recommendation about discipline but modifies a referee's recommendation as too light or too harsh with some frequency. Both the referee and court are doing their respective jobs: The referee is to recommend; the court is to decide.

¶ 110. The referee acknowledged that "making a proper recommendation in this case [is] difficult."[25] The referee recorded favorable comments about Attorney Humphrey and his career and then concluded that Attorney Humphrey violated the Rules of Professional Conduct and that his conduct before the referee suggested "a deliberate attempt not to cooperate in an effort to find the truth. It must be noted that absolutely no contrition was expressed by [Attorney Humphrey]. With all this in mind the least I [the referee] can recommend is a public reprimand."[26]

¶ 111. Many referees oversee the numerous discipline cases. The court's careful review of each referee's recommendation for discipline and the court's careful exercise of its responsibility to impose discipline can bring consistency in discipline from one lawyer discipline case to another. No "spectacle" here.

E

¶ 112. The concurrence/dissent criticizes the court for not pursuing a defense that Attorney Humphrey claimed, namely that the trial court rescinded the statement that Attorney Humphrey clearly misled the

[25] Referee's Findings of Fact and Recommendation at 8. *See also* per curiam, ¶ 63.

[26] Referee's Findings of Fact and Recommendation at 9.

trial court.[27] There is no documentary evidence showing a change by the trial court. At Attorney Humphrey's deposition he said, "[W]hen he [the trial judge] sort of backtracked, later on and he took it back, he made—you know, says disparaging things." It was Attorney Humphrey's obligation, not the referee's or this court's, to pursue Humphrey's assertions in his defense and produce evidence to support the defense.[28] Nothing irregular or sinister here. Nothing unfair to Humphrey. Nothing to undermine confidence in the lawyer regulation system, including the actions of this court.

¶ 113.  In sum, the charge of such "irregularities" that the procedure used and decision are "unfair to attorney [Humphrey] and seriously undermine[] the confidence in the lawyer regulation system, especially the actions of this court" is not proven. None of the purported irregularities holds up under scrutiny.

¶ 114.  Instead, the concurrence/dissent expresses one justice's opinion about Attorney Humphrey's credibility and the facts. It expresses frustration that, as a matter of law, the concurrence/dissent must defer to the referee's assessment of Humphrey's credibility and findings of fact, although the concurrence/dissent nevertheless attempts to retry credibility.[29]

¶ 115.  It turns out that the concurrence/dissent amounts to "nothing more than a disagreement among justices about whether an attorney should receive a

---

[27] Concurrence/dissent, ¶ 156.

[28] Per curiam, ¶ 23 n.2.

[29] The referee heard the testimony, saw the witnesses, and gauged their credibility. A reviewing court must defer to the factual findings and the credibility determination of the trier of facts because the trier is in a better position than is a reviewing court to determine the facts and weigh the credibility of a witness.

public reprimand or a relatively brief suspension,"[30] an issue that the concurrence/dissent writes is worthy of "little" discussion.[31]

¶ 116.   I turn to the issue of discipline.

## II

¶ 117.   The 30–day suspension is "unprecedented," proclaims the concurrence/dissent.[32]

¶ 118.   A 30–day suspension is "unprecedented" only in the sense that in recent years, unlike in years past, the minimum suspension the court ordinarily imposes is 60 days. In the present case the court, like the referee, struggled mightily on the question of discipline. The court decided a public reprimand was too light and a 60–day suspension too severe. The court's imposing an "unprecedented" 30–day suspension probably has worked in Attorney Humphrey's favor.

¶ 119.   In spite of the storm and fury and nasty insinuations about the court's actions, when all is said and done, it turns out that the concurrence/dissent disagrees merely with the imposition of a 30–day suspension. Yet, at the same time the concurrence/dissent concludes that the decision whether to impose a public reprimand or a suspension is an issue worthy of "little" discussion.[33]

¶ 120.   Here again, I must disagree with the concurrence/dissent. I think the discipline to be imposed is worthy of a lot of discussion and very careful thought. The nature of the discipline has significant

---

[30] Concurrence/dissent, ¶ 132.

[31] *Id.*

[32] Concurrence/dissent, ¶ 141.

[33] *Id.,* ¶ 132.

consequences. There is a big difference to the disciplined attorney, to the public, to the bench, and to the bar between a public reprimand and a suspension of any length.[34]

¶ 121. The court is concerned about the effect of discipline cases on the litigants involved, on the bar, on the bench, on the public, and on the public's trust and confidence in the legal and judicial system. For these reasons, the court struggles to impose what it views as the appropriate discipline in each case and tries especially hard to reach unanimous decisions in discipline cases.

¶ 122. The concurrence/dissent inveighs against imposing full costs of the proceeding against Attorney Humphrey.[35] The court carefully considers costs in each case and is fully cognizant of the effect of the imposition of all or a portion of the costs on the attorney charged or on all the attorneys of the state who foot the bill for the lawyer discipline system.[36] The concurrence/dissent protests about costs but does not say what costs it would impose.

¶ 123. What discipline should the court impose on a lawyer who violates the Rules of Professional Conduct in representing the State in a criminal case?

---

[34] *See* SCR 22.26. A lawyer's activities are severely curtailed on a suspension. A lawyer who is suspended has to notify clients and courts of the suspension and make all arrangements for the temporary or permanent closing or winding up of the attorney's practice.

[35] Concurrence/dissent, ¶ 142.

[36] *See* SCR 22.24 (governing costs). See Justice Prosser's concurrence/dissent and my concurrence discussing imposition of costs in discipline cases in *In re Disciplinary Proceedings Against Konnor,* 2005 WI 37, 279 Wis. 2d 284, 694 N.W.2d 376.

¶ 124. The case: Adam Raisbeck, a 17–year-old driver, was in a single-car roll-over accident. One passenger was killed. Another was injured. No drugs or alcohol were involved. In essence, the legal question was whether Adam Raisbeck would be held criminally liable for driving too fast.

¶ 125. Attorney Humphrey is a long-time experienced assistant district attorney. What explains his conduct? The concurrence/dissent ruminates, "it is difficult . . . to imagine what would have motivated an experienced prosecutor to promptly turn over 84 pages of discovery material to the defendant but later insist to a circuit judge that he also turned over or actually supplied accident scene photographs in March when he obviously did not."[37]

¶ 126. The referee in the *Humphrey* discipline proceeding answers: "Sommers and Humphrey apparently had a prior unpleasant history and it appears that Humphrey determined not to be any more cooperative with Sommers than absolutely necessary."[38] Attorney Humphrey "may have been driven . . . by over work or his apparent intense dislike of his opponent."[39]

¶ 127. The justices have struggled mightily, perhaps too mightily, and for far too long, to decide the merits of the charge and the appropriate discipline. The discipline had to fit the offense, considering the attorney's conduct and the mitigating and aggravating circumstances, and considering the effect on the bar,

[37] Concurrence/dissent, ¶ 152.

[38] Referee's Findings of Fact and Recommendation, Finding of Fact 3.

[39] Referee's Findings of Fact and Recommendation at 8. *See also* per curiam, ¶ 63.

the bench, and the public, and trying to ensure fair, effective judicial and legal proceedings that produce fair, just results.

¶ 128. Each lawyer discipline case, including the *Humphrey* and *Sommers* matters, presents a sad and difficult story about lawyers and clients. The Office of Lawyer Regulation, the Preliminary Review Committee, the referees, and the court understand this and take their respective roles very seriously—as they should.

¶ 129. The lawyer discipline system, like any system, has its strong and weak spots, and aspects of the system can be commended and criticized. The handling of any particular case, including the *Humphrey* case, is also subject to both approbation and disapproval.

¶ 130. There is no question that the case took too long. But the handling of the *Humphrey* discipline case was not "irregular," in the sense that the concurrence/ dissent claims, so as to be "unfair to the Attorney [Humphrey] and seriously undermine the confidence in the lawyer regulation system, especially the actions of this court." No such charge should be made in the present case to attack the integrity of the lawyer regulation system or the justices joining the per curiam opinion.

¶ 131. For the reasons set forth, I join the per curiam and write separately.

¶ 132. DAVID T. PROSSER, J. (*concurring in part, dissenting in part*). I respectfully dissent from the level of discipline imposed by the court. If this case involved nothing more than a disagreement among justices about whether an attorney should receive a public reprimand or a relatively brief suspension, there would be little to discuss. But the case involves much more. In

my view, the handling of this case has been so irregular that it is unfair to the attorney and seriously undermines confidence in the lawyer regulation system, especially the actions of this court.

¶ 133. The Office of Lawyer Regulation (OLR) filed three counts of professional misconduct against Attorney Paul W. Humphrey in November 2006. The three counts all relate to Attorney Humphrey's conduct as a Dane County Assistant District Attorney in the State's prosecution of Adam Raisbeck for a traffic homicide. The three counts read as follows:

> 1. By averring in an affidavit filed with Judge [Paul] Higginbotham on May 22, 2002, "That over two months ago, the State . . . made the photographs available to the defendant" and by continuing to maintain that factual position before Judge Higginbotham during a hearing held on June 7, 2002, when in fact he knew that he had informed the defense how to obtain the accident scene photographs less than one month prior, and that the defense did not actually have the photographs as of the morning prior to May 22, 2002, Humphrey engaged in conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of SCR 20:8.4(c).

> 2. By indicating to Judge Higginbotham during a hearing held on August 22, 2002, that he did not know where the State's accident scene photos were, and by failing to affirmatively disclose information concerning the location of the State's photos, when in fact he possessed a complete set of the photos at the time of the hearing, Humphrey knowingly made a false statement of fact to a tribunal in violation of SCR 20:3.3(a)(1), and engaged in conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of SCR 20:8.4(c).

> 3. By failing to turn over to the defense until January 7, 2004, an October 21, 2003, witness state-

ment concerning incriminating declarations that the defendant allegedly made to Witness [Kevin] McCoy following the accident, despite having been served on March 12, 2002, with a valid defense discovery request for "a written summary of all oral statements of the defendant which the State plans to use in the course of the trial and the names of witnesses to the defendant's oral statements," Humphrey did, in pretrial procedure, fail to make a reasonably diligent effort to comply with a legally proper discovery request by an opposing party, in violation of SCR 20:3.4(d).

¶ 134.   At first, the prosecution of Attorney Humphrey proceeded normally. Referee Russell Hanson was appointed to hear the case. Referee Hanson entered summary judgment on Count Three on June 25, 2007. He denied Humphrey's motion for reconsideration on July 10, then heard two days of evidence. He issued his decision on August 2, 2007 (less than a year after the case was filed), finding that OLR had met its burden on all three counts and recommending that Attorney Humphrey receive a public reprimand. This was the same level of discipline sought by the OLR.

¶ 135.   Humphrey appealed, and this court heard oral argument in his case on April 10, 2008.

¶ 136.   These facts tell only part of the story. Attorney Humphrey's case has been linked to matters involving Attorney Joseph Sommers from the beginning of the Raisbeck prosecution, including OLR's subsequent disciplinary proceedings against Attorney Sommers. In virtually every respect, this linkage has worked to Attorney Humphrey's detriment. Attorney Sommers testified against Attorney Humphrey at Humphrey's evidentiary hearing, and then, after Referee Hanson issued a decision in the Humphrey matter,

Attorney Sommers succeeded in removing Referee Hanson from Sommers' own case.

¶ 137. When Attorney Humphrey's case was argued on April 10, 2008, Justice Annette Kingsland Ziegler did not participate. She did not participate because Attorney Sommers had been a candidate for the supreme court against Justice Ziegler in 2007. Justice Ziegler apparently decided that if she should not sit in the *Sommers* case, she should not sit in the *Humphrey* case either. This reduced the size of Humphrey's court from seven to six.

¶ 138. Justice Louis Butler did sit in the *Humphrey* case, but when this court decided to hold the release of any decision on Attorney Humphrey until reaching a decision on Attorney Sommers, it effectively knocked the departing Justice Butler off the case and reduced the size of the court to five.

¶ 139. The decision to hold Attorney Humphrey's case in abeyance had another unfortunate effect: Attorney Humphrey was left twisting in the wind for three and one-half years while this court struggled to resolve the intractable Sommers matter.

¶ 140. Attorney Humphrey played no part in this delay. He simply paid the price for it. The court should have separated the two cases and granted Humphrey's motion for reargument.

¶ 141. Beyond the unseemly delay and its adverse effect on Attorney Humphrey, this court has created the spectacle of invalidating one of the three counts against Attorney Humphrey but nonetheless increasing his discipline from a proposed public reprimand to an unprecedented 30–day suspension (in a case not involving reciprocal discipline). *See* SCR 22.22(3).

¶ 142. In addition, Attorney Humphrey is required to pay the full costs of the prosecution against

him, including OLR's costs in this appeal, even though OLR did not seek increased discipline on appeal and even though OLR lost one of its three counts. The result in this court will send a chilling message to attorneys in discipline cases who may wish to defend their position on appeal.

¶ 143. But there is more. The two remaining counts, 1 and 2, involve semantic disputes about what Attorney Humphrey meant when he made certain representations to the circuit court.

¶ 144. There is no dispute that Attorney Sommers sought accident scene photographs from the State in the *Raisbeck* case. His subpoena for these photographs was quashed by the circuit court on grounds that "discovery" of the photographs before the arraignment was premature. After the arraignment, the defense was entitled to see the photographs and to acquire its own set.

¶ 145. It does not follow, however, that the State was required to *give* the defense its own set of 8 by 10 photographs. The referee made no such finding and the majority opinion does not assert that that is a requirement of the law.

¶ 146. This case would be simple if Attorney Humphrey somehow prevented Attorney Sommers from seeing or acquiring a complete set of accident scene photographs, but that is not the issue.

¶ 147. The facts supporting Count 1 are set out in ¶¶ 7–22 of the majority opinion. On April 25, 2002, Attorney Humphrey sent a letter to Attorney Sommers that said:

> You had requested the photographs taken in this case. As I mentioned, I had loaned them out for a Crash Reconstruction analyst to look at in the course of their

575

investigation. There are several ways for you to access the photographs. If you are willing to stipulate to their foundation, and agree to return them within a reasonable time, I can send them to you. If you want your own copies, you are welcome to contact the [DCSO] [Dane County Sheriff's Office] and order them. They will then print them up and have a bill ready for you to pay when they are picked up. If you just want to look at them, then call me up and set up a time to come in to my office and look at them. I will have them available at the front desk.

¶ 148. On May 2 Humphrey sent Sommers a second letter that said:

At your recent request for your own copies of all the photos, I contacted the Court Officer of the DCSO. Here's what you need to do. Call Lt. Baglama at . . . and request the photos. You will need the Agency Case Number which is 01–53163. They will apparently make the copies and have them ready to pick up upon payment of the invoice.

¶ 149. Both of these letters allude to the established procedure for a defendant to obtain his own set of case-related photographs *after* arraignment. The majority opinion acknowledges Attorney Humphrey's reliance on this procedure:

Attorney Humphrey asserts the usual procedure for defense counsel to obtain a set of crime scene photographs is for the defense attorney to write a letter to the district attorney requesting authorization for the sheriff's department, as the custodian of the negatives, to release a set of photographs to the defense.

. . . .

Attorney Humphrey maintains Sommers was fully aware of the typical protocol for obtaining accident

576

scene photos. Attorney Humphrey includes in his submissions a form letter that is often used by defense counsel to make such requests.

Majority op., ¶¶ 10, 19.

¶ 150. Attorney Humphrey filed an affidavit with the circuit court on May 22, 2002, which stated in part: "That over two months ago, the State provided over 84 pages of discovery materials, *made the photographs available to the defendant,* and provided the scale diagram." (Emphasis added.)

¶ 151. The circuit court and the referee both read the phrase "made the photographs available to the defendant" as meaning that the State gave the defendant the photographs, which Humphrey did not do. They rejected an alternative interpretation of the phrase, that a set of photographs was accessible to the defendant after the arraignment in March, if and when Attorney Sommers sought the photographs by utilizing the established protocol.

¶ 152. It is difficult for this writer to imagine what would have motivated an experienced prosecutor to promptly turn over 84 pages of discovery material to the defendant but later insist to a circuit judge that he also turned over or actually supplied accident scene photographs in March when he obviously did not. It is much easier to accept that Attorney Humphrey's statements were meant to convey a different proposition. Of course, the referee decided otherwise.

¶ 153. The court is constrained by a very rigorous standard of review with respect to the facts found by a referee in an attorney discipline case. I wrote about this standard several years ago:

> I respect and appreciate the work of the court's appointed referees in the Lawyer Regulation System.

Their findings of fact are entitled to great deference and should not be disturbed unless they are clearly erroneous. For the court to adopt a different standard of review would plunge us into a fact-finding role to which we are not well suited.

Because it is important to honor the standard of review, I concur in the decision of the court. I write separately, however, to emphasize that if I had a free hand, I would decide the case differently.

*OLR v. Paget,* 2003 WI 26, ¶¶ 19–20, 260 Wis. 2d 604, 660 N.W.2d 255 (Prosser, J., concurring).

¶ 154.   I concur here as well, with deep reservations, because I am not prepared to assert that the referee's "facts" are clearly erroneous.

¶ 155.   It should be noted, however, that other attorneys in the district attorney's office supported Attorney Humphrey's explanation and position. For example, then-Deputy District Attorney Judy Schwaemle testified at Humphrey's hearing that "it is the policy of the Dane County DA's office . . . to make photographs *available* to defense counsel immediately after arraignment." (Emphasis added.)

¶ 156.   The majority could have removed my reservations about Count One and eviscerated Attorney Humphrey in the process by demolishing his contention "that the referee's report fails to note the district attorney later asked the trial court to rescind this statement [that Attorney Humphrey 'clearly misled the court on that issue']" *and,* more important, that "the trial court agreed." *See* majority op., ¶ 23. If the circuit court actually changed its evaluation of Attorney Humphrey's representations, the validity of Count One would be undermined. The majority appears determined not to pursue such a tough question.

¶ 157.   The reservations I have about Count One also apply to Count Two. Why would Attorney Humphrey assert, suggest, or imply that he did not have a set of accident scene photographs in his office when he had previously admitted otherwise in writing (*see* ¶ 147, *supra*), when he brought two photos with him to court, and when he had already been severely criticized by the circuit court over his handling of the photographs? I don't think he did. More plausible to the writer is that Attorney Humphrey was speaking about Deputy Sewell's set of accident scene photographs, not his own set. Again, the referee decided otherwise.

¶ 158.   The majority is not only comfortable with these determinations, but also willing to create unprecedented discipline to deal with them.

¶ 159.   I believe a suspension of Attorney Humphrey is unwarranted and unfair and that the procedures followed in this case, especially the long delay in this court, are so irregular that they undermine confidence in the lawyer regulation system. Thus, with respect to the sanction, I respectfully but strongly dissent.